# REYNOLDS et al. *v.* BALDWIN, Recorder.

The remedy by writ of *quo warranto,* authorized by the Code of Practice, is not confined to cases of usurpation of office only. It is also the proper remedy in case of the usurpation of a franchise, as where it is alleged that a party claims, without authority, to, exercise the rights, duties and privileges of an alderman. Act of 17 February, 1805, s. 22. C. P. 789, 828, 867 to 871. The laws of this State do not recognize the distinction between the different kinds of usurpation known to the common law.

The provision of art. 870 of the Code of Practice that, when the court shall, on a writ of *quo warranto,* declare the person against whom it was issued not qualified to fill the place of which he performs the duties, it "shall direct the corporation to proceed to a new appointment," means only that such an order shall be made when a new appointment is necessary.

In the interpretation of statutes the intention of the lawgiver is to be deduced from a view of the whole, and of every part of the statute taken together. Where in the preamble, or in any particular clause, an expression is used not so large and extensive in its import as those used in other parts of the act, effect must be given to the larger expression. A statute should be so construed, if possible, that no clause, sentence, or word shall be superfluous, void, or insignificant.

The division of laws establishing and regulating municipal corporations into organic and ordinary, is unknown in this State.

In the country from which we derive our ideas on the subject of municipal corporations, the charters of cities were, as their name implies, contracts, entered into between the corporators on the one hand, and the king or feudal lord on the other, by which liberties or franchises were bartered for personal services or money. They were intended to be permanent, and could not be lawfully taken away, being, in the true sense of the word, franchises· But the relation between our municipal corporations and the sovreign, is not the same.

The laws enacted under the provision of the 23d sect. of the 6th art. of the State constitution of 1812, establishing and regulating the municipalities of New Orleans, are not contracts, but ordinary acts of legislation. The powers they confer are not franchises, in the original meaning of that word, but mandates only; and these laws may be repealed at pleasure, except so far as their repeal may affect rights acquired by third persons under them. They must be construed and applied, in all cases, like other laws.

The 5th sect. of the act of 17 February, 1805, and the 2d, 5th, and 8th sects. of the act of 8 March, 1836, in relation to the powers of the recorders in the city of New Orleans, must be viewed as if they formed part of one and the same statute, and be so construed that no clause, sentence or word, shall be superfluous, void or insignificant.

Neither the second section of the act of 8 March, 1836, nor any other law, authorizes the recorder of a municipality in the city of New Orleans, to exercise the rights and privileges of an alderman, by voting in the deliberations of the council where the members are not equally divided.

A PPEAL from the District Court of the First District, *Buchanan,* J. *Durant,* for the plaintiffs.

*R. Hunt* and *Roselius,* for the appellant. The act of 1805, incorporating the city of New Orleans, provided that, among other officers of the city, there should be a recorder and fourteen aldermen, to be elected in the mode therein prescribed; that, the aldermen so chosen should form a council to be called "the city council," of which the recorder, for the time being, should *ex officio* be president, but that he should have no vote, except a casting vote; and that the said council should have power to govern the city and administer its affairs, and to make bye-laws and ordinances for the better government of its affairs, &c.

It had often happened in the administration of the affairs of corporations, composed of an even number of voters, that salutary by-laws could not be made, and that the elections of necessary and proper officers could not be effected, in consequence of an equal division of voters. This had given rise to much confusion and various illegal devices, for the purpose of enabling corporations to act in such cases. See 6 Term Rep. 732, and the cases there cited. The legislature therefore provided in the charter of the city of New Orleans against such a contingency. It made the recorder *ex officio* president of the council of fourteen aldermen; and vested in him the right, in case of an equal division among the aldermen, to give a casting vote.

Before the division of the city into three municipalities, the recorder was an officer of little importance. His chief duty was to preside over the council. In case of a vacancy in the office of recorder, or of his absence, or inability to discharge his duties, the council was authorized to choose one of their members as president pro tempore. No other provision was made to supply his place, or to impose his duties on a substitute; simply, because he had no other functions of importance to perform.

In 1836, the city was divided into three municipalities: each municipality was vested with a government of its own. The number of aldermen was no longer fixed and limited; but it was made the duty of the several municipal councils to apportion the number of aldermen to which they might be respectively entitled, in the ratio of one alderman for every hundred voters residing

therein. It was evident, therefore, that the number of aldermen would fluctu-ate from year to year, and no one could say with certainty that the council of any one of the municipalities, would consist of an even number; and the confu-sion attendant upon an equal division of votes among the aldermen not being likely to take place, there was no particular reason for continuing in the recorder the power of giving a casting vote only.

In remodelling the charter of the city in 1836, the legislature deemed it expe-dient to make the recorder a component part of the municipal council. The 2d section of the act provides that each municipality shall be governed by a council composed of a recorder, and the aldermen elected by the wards within the limits thereof. The recorder was thus made a member of the council—a *constituent, component part thereof*, expressly authorized to participate equally with every other member in the government of the municipality and the admi-nistration of its affairs. The council can only govern the municipality and ad-minister its affairs, by passing ordinances, making by-laws, electing officers, &c. These duties and powers can only be exercised by the council in the ordi-nary way' recognised by law, that is to say, by voting, so that the will of the majority may be ascertained, for the " *lex majoris partis* is the law of all coun-cils, elections, &c., where not otherwise provided." If, then, the recorder is to participate as a member of the council in passing by-laws and ordinances, in governing the municipality and administering its affairs, he must exercise the right to vote. The recorder and the aldermen derive the right to vote from the same law. The right is conferred upon them, in the same section and in the same words, as members of the " council composed of a recorder and the al-dermen." It is admitted that the aldermen have a right to vote. It can not then be fairly denied that the recorder has also the right.

But it is argued that, although the 2d section of the act, just quoted, makes the recorder a part of the council, another section of the same act establishes the contrary. The 5th sections declares that, each of said municipalities shall be governed and the affairs thereof administered, by a recorder and a council composed of aldermen. There is some difference in the language of the 2d and of the 5th section; but when properly understood, there is no opposition in the meaning of the two. The 2d section declares that the council shall be com-posed of a recorder and the aldermen. The 5th section speaks of a recorder and a council composed of aldermen. But the latter, like the former section, provides that the municipality shall have its affairs administered by a recorder as well as by the aldermen. The recorder is made one of the governing officers, and one of those appointed to administer the affairs of the municipality by the 5th, as well as by the 2d section.

It is said that the recorder is not a member of the council, because the act of 1840 (Bullard & Curry's Dig. p. 132, s. 1,) says, "that the council of Munici-pality No. 2, of the city of New Orleans, shall in future be composed of twelve aldermen." The most universal and effectual way of discovering the true mean-ing of a law, is by considering the cause which induced the legislature to enact it. Prior to the passage of the act of 1840, referred to, the number of alder-men to which the council of the several municipalities were entitled, was appor-tioned in the ratio of one alderman for every hundred voters residing therein. Act of 1836, s. 6. In 1840 it was found that, from the immense increase of voters in New Orleans, this rule would make the council consist of a number of aldermen, quite too large for practical purposes. The legislature resolved, there-fore, to abolish the rule, and accordingly enacted that the council of Municipality

No. 2, should, in future, be composed of twelve aldermen. The object of the law evidently was only to diminish and limit the number of aldermen.

*Grymes*, on the same side.

The judgment of the court was pronounced by

ROST, J. After the late elections in the city of New Orleans, the council of Municipality No. 2 met, *Joshua Baldwin*, recorder, in the chair, and thirteen aldermen, being a full board, in their seats. They transacted some business, and *M. M. Reynolds*, one of the aldermen, presented the following resolution, and moved its adoption :

"*Resolved*, That we now proceed to adopt rules for the governing of this council."

The recorder decided this resolution to be out of order, and *Reynolds* appealed from his decision, and called for the yeas and nays on the question, "shall the decision of the chair be sustained."

The yeas and nays were ordered, and when counted stood six yeas and seven nays; whereupon the recorder voted with the minority, asserting his right to do so under the 2d section of the act dividing the city into three municipalities, which makes, in his opinion, the recorder a component part of the council, and thus gives him, by implication, the powers of an alderman. By his vote, his decision was sustained.

The seven aldermen who voted in the negative, instituted proceedings in the nature of a *quo warranto*, to test the legality of the vote given by the recorder, and, if it should be found illegal, to obtain an order forbidding him to exercise hereafter the rights, duties and privileges of an alderman.

The defendant came into court and excepted to the petition, writ and proceedings, on the ground that, it is not a case in which a writ of *quo warranto* can or ought to issue, there being no law to authorize the issuing of such a writ in the premises; and, should his exception be overruled, he filed a general denial, and averred that he had confined himself within the duties, rights and privileges of a recorder, and had never usurped or exercised the rights, duties and privileges of an alderman. The court of the first instance having overruled the exception of the defendant, and rendered judgment against him on the merits, he appealed.

It is contended on the appeal that, the exception of the defendant was improperly overruled, because the writ of *quo warranto*, as authorized by the Code of Practice, can be resorted to in cases of *usurpation of office* only, and because the defendant, so far from having usurped *the office* of alderman, has from the beginning disclaimed any title to that office,' or any intention to usurp or exercise the rights, duties and privileges thereof, and simply considers it his right, in virtue of his own office, as recorder, to vote in the deliberations of the council.

The petition does not charge that the defendant has usurped the office of alderman, but that he has exercised, and claims, without authority, the power to exercise the rights, duties and privileges of an alderman. This is not, according to the technical distinctions of the common law, the *usurpation of an office ;* it is the *usurpation of a franchise.*

"Wrongfully and unjustly holding and presiding at a court of record of a *borough*, in the absence of the bailiffs, is not *an usurpation of the office* of bailiff, for the intruder may have thought it his right or his duty *in virtue of his own office as recorder or town clerk;* yet it is an usurpation of the office of a judge, or of the franchise f holding the court, for which an information may be granted at common law." *Rex v. Williams*, 1 Bur. 407. S. C. 2 Kenyon, 75.

REYNOLDS
v.
BALDWIN.

In England there is a remedy *at common law*, for both kinds of usurpation, by an information in the nature of a *quo warranto*, filed by the attorney general in the court of King's Bench; and, under the statute of Ann, the court may besides authorize private persons to proceed in the same manner, in cases of usurpation of office.

This distinction in the various kinds of usurpation, does not exist under our laws. The 22d section of the act of 1805, establishing the Superior Court, provided as follows: " The Superior Court shall have power to issue writs of *quo warranto, procedendo, mandamus* and *prohibition*, which writs shall preserve the forms, and be conducted according to the *rules and regulations prescribed by the common law.*"

Under this statute, a writ of *quo warranto* was the proper remedy for both kinds of usurpation. The Code of Practice subsequently made provision for the form and manner of proceeding; but we do not understand that it restricted the cases in which the writ could issue before. The only restriction is contained in that portion of article 868, which refers to offices conferred in the name of the State by the Governor, with or without the consent of the Senate.

Article 828 defines the writ of *quo warranto* to be, an *order of which the object is to prevent an usurpation*. This definition clearly embraces usurpation of franchises as well as of offices. The very case put by article 868, is the usurpation of a franchise. This mandate is only issued, says that article, for the decision of disputes between parties, in relation to offices *(fonctions*, says the French side) in corporations, *as when a person usurps the character of mayor* of a city. The *character* of mayor is not, technically speaking, an office, but a franchise. See also art. 789 of the Code of Practice.

It is true that article 870 ordains that, if the judgment be against the defendant, the court shall direct the corporation to proceed to a new appointment; but the legal construction of this article, taken in connection with those that precede it on the same subject matter, is, that such an order shall be made when a new appointment is necessary. It is an exception to the general dispositions contained in the other articles, and does not limit them in any manner.

" It is an established rule in the exposition of statutes that, the intention of the lawgiver is to be deduced from a view of the whole and of every part of the statute, taken and compared together. In construing acts of parliament, the courts are not to look only at the language of the preamble, or of any particular clause. If they find in the preamble, or in any particular clause, an expression *not so large and extensive in its import, as those used in other parts of the act*, it is their duty to give effect to the *larger expressions*. Indeed a statute ought, upon the whole, to be so construed, that, if it can be prevented, no clause, sentence or word should be superfluous, void or insignificant." Per Lord Tenterden, *Doc dem. Bywater and Brandling*, 7 B. and C. 643.—*Rex* v. *Burckett*, Hard. 344, 1 Shaw, 108. Dwarris on Statutes, p. 21.

The order to proceed to a new appointment, could not always be made, even in cases of usurpation of office. If, after a candidate for the office of mayor had obtained a majority of the votes, his competitor should take the oath of office, and attempt to exercise the functions thereof, a writ of *quo warranto* would be the proper remedy against him; and yet the judgment rendered in the case could not order a new election.

We are satisfied that the exception was properly overruled.

On the merits, the law of the case is contained in the following sections of various acts of the legislature.

The 5th section of the act of incorporation of the city of New Orleans, approved on the 17th of February, 1805, provides "that the aldermen shall form a council to be called the city council, *of which the recorder, for the time being, shall, ex-officio, be president, but shall have no vote except a casting vote,* unless at such time as the council shall resolve itself into a committee of the whole."

In 1836 the city was divided into three municipalities, by an act entitled "An act *to amend the act entitled* an act to incorporate the city of New Orleans, approved Feb. 17th, 1805, and other acts amending the same."

The 2d section of that act provides, "that each municipality shall be governed, and its affairs administered by a council, composed *of a recorder, and the aldermen elected* by the wards within the limits thereof."

Section 5th of the same act says, "that each municipality shall be governed, and the affairs thereof administered, *by a recorder, and council composed of aldermen;*" and it provides for the time and manner of their election.

Section 8th of the same act provides, "that the *powers and duties of recorders and aldermen* shall be the same, within the limits of their respective municipalities, as they were before in the city of New Orleans.

By the 1st section of an act passed in 1840, it is ordained that, the council of Municipality No. 2 *shall in future be composed of twelve aldermen.*

It is not denied that, up to 1836, the recorder could not vote in the deliberations of the council, and had only a casting vote; but it is contended that, by the 2d section of the act of that year, the recorder is made a component part of the council, and has the right to vote in all cases. It is further alleged that this last act being the organic law of Municipality No. 2, its provisions cannot be repealed by implication.

The act of 1836 does not purport to be an original organic law. Its very title, as we have already seen, negatives the idea; and its details and provisions clearly show that, it was nothing more than an amendment of the laws existing on the same subject before its passage.

The division of the laws which establish and regulate municipal corporations into organic and ordinary, does not exist under our form of government. In the country from which we derive our ideas on the subject of municipal corporations, the charters of cities were, as their name implies, contracts, entered into between the corporators on the one hand, and the king or feudal lord on the other, by which liberties and franchises were bartered for personal service or money. The rights and powers which those charters conferred, were of the nature of those secured to the people at large by our constitutions. They were intended to be permanent, and could not be lawfully taken away; they were, in the true sense of the word, franchises. But the relation existing between our municipal corporations and the sovereign, is not the same; and it is strange that this fact should continue to be so obstinately overlooked by their officers.

The twenty-third section of the general provisions of the old constitution ordained, that the citizens of the town of New Orleans "should have the right of appointing the several public officers necessary for the administration and the police of the said city, pursuant to the mode of election prescribed by the legislature." This provision constituted the municipal government of this city, a subordinate agency for purposes of police and good order. The laws which, under that provision, have established and regulate the municipalities, are not

contracts; they are ordinary acts of legislation. The powers they confer are no longer franchises, in the original meaning of that word; they are nothing more than mandates; and those laws may be repealed at pleasure, except so far as their repeal may affect rights acquired by third persons under them. They are all of the same nature, and must be construed and applied in all cases like other laws.

The provisions of the different statutes already cited in relation to the power of recorders, must be viewed as if they formed part of one and the same statute, and be construed, as far as practicable, *so that no clause, sentence, or word in them be superfluous, void, or insignificant.*

The 5th section of the act of 1805 ordains that, except in cases when the council resolves itself into a committe of the whole, *the recorder shall have no vote, except a casting vote.* How has this express prohibition been repealed?

The argument by which such a repeal is deduced from the 2d section of the act of 1836, violates every known rule of interpretation, and can hardly be considered as serious. That section says that the council shall be composed of *a recorder and the aldermen;* but it must be construed with reference to all the others *in pari materia,* found in the different laws of the corporation. It is a declaratory law, granting no new power. As there is no deliberative assembly without a presiding officer, after the act of 1805 had provided that the recorder should be *ex-officio* president of the council, the council was in reality composed of *a recorder and the aldermen;* each exercising the functions assigned to them by law. This is the legal intendment of the 2d section of the act of 1836, viewed with reference to the other laws *in pari materia.* It is identical with that of the 5th section, and has been considered by every body so to be, since the passage of the act in which it is found.

The legislature was so careful to leave no room for doubt on this subject, that it provided by the 8th section *that, the powers, duties and rights of recorders should remain the same as they were before.* The 2d section was not intended to make any change in those powers; and, if it should be conceded that the power claimed might at one time have been exercised under it by implication, that power was certainly taken away, in the same manner, by the act of 1840. The 2d section of the act of 1836 ordains that each municipality shall be governed, and its affairs administered by a council *composed of a recorder and the aldermen.* The 5th section of the same act provides that, each municipality shall be governed, and the affairs thereof administered, by *a recorder and council composed of aldermen;* and by virtue of the 8th section, the powers and duties of recorders are to remain the same as they were before. Under the construction which it suits the defendant to put upon the 2d section, those three dispositions cannot stand together, and the first, or the two last, must give way. The defendant contends that the first ought to prevail; but the law is against him. " If the latter part of a statute be repugnant to the former part thereof, it shall stand, and, so far as it is repugnant, be a repeal of the former part, because it was the last agreed to by the makers of the statute." Dwarris on Statutes, p. 31, and the cases there cited.

If the act of 1840 had never been passed—if the 5th and 8th sections of the act of 1836 were not found in it, the 2d section of that act would not give to the defendant the power he claims. The law does not favor repeals by implication, and " when there is a difference in the whole perview of two statutes, apparently relating to the *same object, the former remains in force.*" *Rex* v.

*Downes,* 3 T. R. p. 569. So that if the 2d section of the act of 1836 had stood alone, it would not have repealed any part of the 5th section of the act of 1805, and the powers of the recorder would have remained the same as before. We could not view the different laws regulating the powers, rights and duties of recorders as one single statute, and give effect to all their provisions, as it is our duty to do, without coming to the conclusion that the defendant has no color of right to exercise the powers he claims.

The opinion of the court is unanimous, clear and decided, that the judgment must stand. *Judgment affirmed.*